UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID T. BURBO,

            Plaintiff,                  CIVIL ACTION NO. 10-14173

      v.                         DISTRICT JUDGE STEPHEN J. MURPHY, III

COMMISSIONER OF             MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

            Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [9, 12]**

Plaintiff David Burbo, proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 405(g)

challenging the final decision of Defendant Commissioner of Social Security ("Commissioner")

denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI") under the Social Security Act.  Both parties filed summary judgment motions (Dkt. Nos. 9,

12; *see also* Dkt. No. 13), which are presently before this Court for a Report and Recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B) and E.D. Mich. L.R. 72.1(b)(3).[1]

---

[1] The Court notes that while there is no order of reference, this District's Local Rules provide:
"All cases seeking review of a denial of social security benefits will be assigned both to a district
judge and a magistrate judge by the clerk of the court at the time of filing. . . .  The magistrate judge
will determine all non-dispositive motions in such cases pursuant to 28 U.S.C. § 636(b)(1)(A) and
*will* file a report and recommendation in each such case pursuant to 28 U.S.C. § 636(b)(1)(B) and
(C)."  E.D. Mich. L.R. 72.1(b)(3) (emphasis added).

-1-

## I. RECOMMENDATION

For the reasons set forth below, this Court finds that the reasons the Administrative Law Judge gave for discounting Plaintiff's credibility are not supported by substantial evidence. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.[2]

## II. REPORT

### A. Procedural History

This is the second of three disability applications filed by Plaintiff.

On September 6, 2006, Plaintiff filed an application for DIB alleging a disability onset date of November 16, 2004. (Tr. 91.) On July 22, 2008, Administrative Law Judge ("ALJ") Zane Gil issued a decision denying that application. Plaintiff sought judicial review in this District and on May 20, 2010, Magistrate Judge Donald A. Scheer issued a Report and Recommendation to affirm ALJ Gil's decision. *Burbo v. Comm'r of Soc. Sec.* ("*Burbo I*"), No. 09-13663 (E.D. Mich. May 20,

---

[2]  The Commissioner asserts that "Plaintiff's motion for summary judgment reveals that his wife, Laura Burbo, actually drafted and submitted the motion despite the fact that Plaintiff purports to bring his case *pro se*." (Dkt. No. 12, Def.'s Mot. Summ. J. at 2.) And, according to the Commissioner, "Plaintiff's brief should be stricken, as his wife is neither a party to this litigation, nor counsel, and her signing of the motion violates Local Rule 83.20, as well as Michigan Compiled Laws." (*Id.*)

The Court will not strike Plaintiff's motion. The Commissioner is correct that under the closing "respectfully submitted," the typewritten words "Laura Burbo Spouse" appear. (Dkt. 9, Pl.'s Mot. Summ. J. at ECF Pg ID 567.) But, under that same closing, a typewritten "/s/David T. Burbo" also appears along with Plaintiff's hand-written signature. (*Id.*) In addition, the brief in support of the motion is "respectfully submitted" by "David T. Burbo" and the Certificate of Service is hand-signed "David T. Burbo." (*Id.* at ECF Pg ID 590, 591.) Laura Burbo neither hand-signed nor used an "s/" on the motion or brief.

2010) (Report and Recommendation, Dkt. No. 21).   On July 28, 2010, District Judge Patrick J. Duggan entered an Opinion and Order adopting the Report and Recommendation. *Burbo I*, No. 09-13663 (E.D. Mich. July 28, 2010) (Op. adopting Report, Dkt. No. 24).   Plaintiff appealed the District Court's decision, and, recently, the Sixth Circuit Court of Appeals affirmed. *Burbo I*, No. 09-13663 (6th Cir. Sept. 21, 2011) (Order from Court of Appeals, Dkt. No. 28).

On September 16, 2008, Plaintiff filed the applications for DIB and SSI that are at issue in this case.   Those applications allege a disability onset date of May 14, 2008.   (Tr. 128.)   The Commissioner initially denied the applications on January 9, 2009.   (Tr. 128.)   Plaintiff then filed a request for a hearing, and on September 28, 2009, he appeared with counsel before Administrative Law Judge Roy L. Roulhac, who considered the case *de novo*.   (Tr. 48-71.)   In an October 30, 2009 decision, the ALJ found that Plaintiff was not disabled.   (Tr. 113-24.)   On December 23, 2009, ALJ Roulhac reopened the case, and granted Plaintiff a supplemental hearing "because of additional evidence submitted."   (Tr. 74; *see also* Tr. 72-87.)   He then issued a second decision on January 8, 2010, again denying Plaintiff's application for benefits.   (Tr. 128-40.)   That decision became the final decision of the Commissioner on August 20, 2010 when the Appeals Council denied Plaintiff's request for review.   (Tr. 1.)   Plaintiff filed this suit on October 19, 2010.   (Dkt. No. 1.)

Sometime after ALJ Roulhac's January 8, 2010 decision, Plaintiff filed a third application for DIB along with another application for SSI; both applications alleged an onset date of January 9, 2010.   (Dkt. No. 13, Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. 1 at ECF Pg ID 660.)   In a March 21,

2011 decision, ALJ Myriam Fernandez Rice found that Plaintiff had been disabled since January 9, 2010. (*Id.*, Ex. 1 at ECF Pg ID 660, 666.)[3]

## B. Background

On November 16, 2004, while making a right-hand turn in a small pickup truck, Plaintiff was rear-ended by a semi. (Tr. 340.) Plaintiff's truck was totaled and he has suffered from back and neck pain since the accident. (*See* Tr. 340.) Plaintiff also has issues with his right knee which has been subject to multiple surgeries. (Tr. 329, 533.) Plaintiff was 47 years old at the time of the ALJ's January 2010 decision, is married, and has two children. (Tr. 57, 220.) He has a high school education, and he previously worked as a seat builder, a laborer in a steel mill, an operating engineer, and a landscaper. (Tr. 51-57.)

### 1. The Hearing Before the ALJ

As noted, ALJ Roulhac heard testimony regarding the disability applications under review on two separate dates, September 28, 2009 and December 23, 2009. Because the second hearing supplements the first, the Court presents a single summary of the testimony from both hearings.

---

[3] Given the foregoing, it appears that the disability period at issue in this case is limited. ALJ Gil's decision (as affirmed through judicial appeals) is *res judicata* on the issue of Plaintiff not being disabled within the meaning of the Social Security Act on or before July 22, 2008. *See Drummond v. Comm'r of Soc. Sec.*, 126 F. 3d 837, 840-42 (6th Cir. 1997) ("Social security claimants are bound by the principles of res judicata."); *Caudill v. Comm'r of Soc. Sec.*, 424 F. App'x 510 (6th Cir. 2011). And, Plaintiff has been deemed disabled under the Act since January 9, 2010. (Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. 1.) Accordingly, less than 18 months of benefits (those between July 23, 2008 and January 9, 2010) appear to be at issue in this case. (As to preclusion, while Plaintiff's first application was only for DIB, the Court is not aware of any material distinctions in the disability standards for DIB and SSI that would be applicable in this case. Moreover, ALJ Roulhac accorded ALJ Gil's decision preclusive effect (Tr. 128), and Plaintiff has not appealed that finding to this Court.)

*(a) Plaintiff's Testimony*

Plaintiff testified he is unable to work due to the pain from his neck and back. (Tr. 5.) He explained that the pain affects his left hand and foot and that he "barely" sleeps. (Tr. 58.) He acknowledged that while a doctor has recommended "cervical disc fusion and caging," he has been too afraid to have that surgical procedure performed. (Tr. 62.) He explained that his pain was a "nine" on a ten-scale (ten indicating the need to go to the emergency room) but that if he takes his Vicodin his pain decreases to a "six." (Tr. 64.) Plaintiff also testified to a closed-head injury and being treated for depression. (Tr. 61, 83.)

Regarding his functional limitations, Plaintiff said that lifting ten pounds was "a lot" for him, that walking 30-40 yards made him feel "pretty bad," that he could stand for 15 minutes with his cane, and could sit for "five minutes without . . . discomfort." (Tr. 63.)[4]  Plaintiff testified he had been using a cane for about three years because his left leg was hard to pick up and move forward. (Tr. 57.) Plaintiff further said that his medications, Vicodin, Lexapro, and Cymbalta, make him "very tired." (Tr. 58.)

Plaintiff explained that on a typical day he wakes up, immediately takes his medication, and watches his children get ready for school. (Tr. 60.) Plaintiff said he lies down for about six hours during the day and takes a hot shower every morning to help with his back. (Tr. 65.) He does not shop, and while he can help put away dishes from the dishwasher "once in a while," that is "about as much" as he can do. (Tr. 60.) He explained that he sometimes has problems dressing himself

---

[4]  At the second hearing before the ALJ, Plaintiff said he could stand for "a good two-and-a-half minutes, and then the pain is very bad." (Tr. 80.) He also stated at the second hearing that he could sit for about 15 minutes depending on the chair he was using, and that he could lift "probably a pound-and-a-half." (Tr. 81.)

because he cannot bend down far enough to pull his pants past his ankles.  (Tr. 82.)  Plaintiff's wife's testimony was in accord with Plaintiff's: she explained that Plaintiff is in "bed at least three or four times a day, and then he is back to bed by 9 [p.m.], and then is up by 3 or 4 [a.m.]."  (Tr. 83.)

Although the time period is a bit unclear, Plaintiff indicated, with clarification from his wife, that he had seen a psychiatrist after the alleged onset date in this case but quit seeing him because of financial reasons.  (Tr. 77.)  Plaintiff stated he saw a psychiatrist for pain management and depression.  (Tr. 78.)

*(b) The Vocational Expert's Testimony*

Vocational Experts ("VE") testified at both hearings.  (Tr. 66-70, 85-86.)  At the second hearing, the ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, and past work experience limited to

> performing a range of sedentary work, . . . to sitting for six hours and standing for two hours in an eight hour day, and lifting not more than 10 pounds with pushing and pulling consistent with those weight restrictions, and has a sit/stand option at the employer's tolerance. [And is further limited to] [o]ccasional balancing, stooping, kneeling, crouching, and crawling, but no ladder climbing, ropes, or scaffolds[;] [o]ccasional climbing ramps and steps, and [requires] the use of a cane for ambulation and balance.  This hypothetical person should avoid unprotected heights, and be limited to performing simple tasks.

(Tr. 85.)  The VE responded that the hypothetical individual could perform various "sedentary[,] unskilled jobs": surveillance system monitor (500 jobs in Southeastern Michigan), assembler (1,000 jobs), and inspector (1,000 jobs).  (Tr. 86.)[5]

---

[5]  At the first hearing, the VE considered a very similar hypothetical.  (Tr. 69.)  That VE testified that there were jobs available to the hypothetical individual in the categories of receptionists and information clerks, general office clerks, and surveillance system monitors.  (Tr. 69-70.)

2. *Medical Evidence*

(a) *Imaging Studies and Other Diagnostic Testing of Plaintiff's Physical Impairments*

In the year-and-a-half following the November 2004 accident, Plaintiff underwent a number of diagnostic tests. (*See* Pl.'s Mot. Summ. J., Ex. 1 at ECF Pg ID 592-95.) Because the test results are summarized at length in Plaintiff's brief (*see id.*), and because the results are all from well before the alleged onset date in this case, this Court offers only a brief summary of these studies here. In December 2004, Plaintiff underwent an electromyogram which revealed left L5 radiculopathy. (Tr. 335).[6] A CT scan from that month showed "degenerative disc disease, most marked at L3-L4 and moderate at L4-L5 with disc space narrowing, vacuum disc and foraminal encroachment." (Tr. 342.) An April 2005 MRI showed "spondylotic central canal stenosis" in the cervical spine (C4 through C7), leading to effacement upon the thecal sac. (Tr. 350.)[7] A contemporaneous CT scan of Plaintiff's lumbar spine showed "mild central canal and bilateral inferior neuroframinal stenosis." (Tr. 350.) In May 2006, Plaintiff underwent another MRI of his cervical spine for purposes of comparing a February 2005 study. (Tr. 357.) The MRI revealed spinal stenosis along with

_____

[6] "Disease of the nerve roots." *Dorland's Illustrated Medical Dictionary* 1595 (31st ed. 2007).

[7] "Spinal stenosis is a narrowing of one or more areas in your spine — most often in your neck or lower back. This narrowing can put pressure on the spinal cord or spinal nerves at the level of compression. Depending on which nerves are affected, spinal stenosis can cause pain or numbness in your legs, back, neck, shoulders or arms; limb weakness and incoordination; loss of sensation in your extremities; and problems with bladder or bowel function. Pain is not always present, particularly if you have spinal stenosis in your neck." Mayo Clinic Staff, Definition of Spinal Stenosis *available at* http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (last checked Dec. 9, 2011).

"moderate to marked degenerative changes throughout the cervical spine." (Tr. 357.) These findings, however, were not significantly different from those in February 2005. (Tr. 357.)

> *(b) Treatment Notes, Medical Evaluations, and Opinion Evidence Regarding Plaintiff's Physical Impairments*

In December 2004, Plaintiff saw Dr. Fernando Diaz regarding low back and left lower extremity pain. (Tr. 466.) Dr. Diaz found that Plaintiff walked with a "limping gait" and that his heel-toe walk was limited by pain. (Tr. 466.) In February 2005, Dr. Diaz noted that Plaintiff walked with a slight "limping gait" but that his "[s]traight leg raising, sciatic notch, foraminal compression signs and Patrick signs are negative bilaterally." (Tr. 342.) In March 2005, Dr. Diaz, recommended that Plaintiff undergo an "anterior cervical discectomy with arthrodesis fusion and instrumentation . . . at C6-C7 and C3-C4." (Tr. 340.) It appears that Plaintiff never underwent this surgical procedure.

In March 2005, Dr. Miles Colwell at the University of Michigan evaluated Plaintiff. Plaintiff reported 10 out of 10 pain. (Tr. 449.) Dr. Colwell noted that "[w]ith regard to other activities of daily living, [the patient] circle[d] 10 for total disability for everything listed. This includes family home responsibilities, recreation, social activity, occupation, intimacy, self-care, and life support activities." (Tr. 448.) Dr. Colwell found moderate-to-severe degenerative changes in Plaintiff's lumbar and cervical spine, but also remarked, "It is difficult to fully tell . . . what should or should not be done surgically. Though [patient] circles 10s, he did not appear to be at that level of pain during the exam today." (Tr. 450.)

In November 2007, Plaintiff saw Dr. Diana Wilsher, his primary-care physician since 2002, for a checkup. (Tr. 324.) Plaintiff reported a "picky" sensation in the toes of his left foot and the

-8-

last three digits of his left hand.  (*Id.*)  Dr. Wilsher found decreased strength in Plaintiff's left leg.  (*Id.*)  The next month, Plaintiff reported to Dr. Wilsher that he was getting "some relief" from therapy; her examination of Plaintiff was "unchanged."  (Tr. 323.)

A February 2008, physical therapy "reevaluation" provides that Plaintiff had gone to 27 appointments and while Plaintiff had "positive response[s] from . . . each appointment," he "did not appear to be demonstrating significant carryover relief . . . to subsequent appointments."  (Tr. 368.)

On March 12, 2008, Plaintiff returned to Dr. Wilsher.  (Tr. 321.)  Her examination revealed that Plaintiff had significant difficulty in "lower body movement such as squatting and kneeling," and that Plaintiff could not "maintain any of these positions for any significant amount of time."  (Tr. 321; *see also* Tr. 362.)  Dr. Wilsher found that Plaintiff's right hand function was fine, but his left hand was "limited with regard to a grasp deformity that he suffers in the fifth digit."  (Tr. 321.)  That same day, March 12, 2008, Dr. Wilsher completed a functional assessment; she opined that Plaintiff could sit for only 3.5 hours, stand for one hour, and walk for one hour during an eight-hour workday.  (Tr. 325.)  She also found that Plaintiff could "frequently" lift 5 pounds, but only "occasionally" lift 10 pounds, and never lift anything more than 10 pounds.  (Tr. 324.)  Dr. Wilsher opined that Plaintiff could finger "continuously" with both hands, and continuously "handle" items with the right hand.  (Tr. 326.)  She also provided that Plaintiff could "never" squat, kneel, climb, crouch, or crawl.  (Tr. 326.)

In May 2008, Plaintiff saw Dr. Wilsher for a "quarterly checkup" and reported that his back pain was about the same.  (Tr. 361.)  He inquired into physical therapy, and Dr. Wilsher noted that Plaintiff "should follow up . . . in the near future for full physical."  (Tr. 361.)  In a May 2008

-9-

physical therapy evaluation, Plaintiff reported a sitting tolerance of 25 minutes, standing tolerance of 15 minutes, and lifting limit of 20 pounds.  (Tr. 364.)

On August 6, 2008, Dr. Wilsher completed another functional capacity assessment of Plaintiff.  (Tr. 329-34.)  She diagnosed Plaintiff with "chronic, long-term [right] knee pain (6 surgeries)," chronic neck pain, disc disease, and "chronic back [pain?], disc disease."  (Tr. 329.)  As in her March 2008 opinion, she found that Plaintiff could sit for a total of three hours in an eight-hour workday, and stand and/or walk for two hours total during the workday.  (Tr. 330-31.)  She also provided, however, that Plaintiff had to lie down for six hours (total) in an eight-hour workday.  (Tr. 331.)  And, unlike her March assessment, she found that Plaintiff could only "occasionally" lift one to five pounds and "never" anything greater.  (Tr. 332.)  Dr. Wilsher provided that these restrictions had "existed and persisted" since November 2004.  (Tr. 334.)  On a contemporaneous exam note, Dr. Wilsher provided that Plaintiff "has problems with neck pain, back pain, arm pain, and leg pain related to those as well as chronic knee pain. . . .  Necessary paperwork was completed with help from him as far as what his limitations are.  Follow up for full physical at a later date."  (Tr. 360.)  She also renewed Plaintiff's prescriptions for Vicodin (twice daily), Lexapro, and Cymbalta.  (Tr. 360.)

In October 2008, Dr. Kevin Sprauge performed total knee replacement surgery on Plaintiff's right knee.  (Tr. 374-75.)  In December 2008, Plaintiff had a followup visit with Dr. Sprauge.  Plaintiff reported that his right knee was doing great and that his left knee continued to improve.  (Tr. 390.)  Dr. Sprauge expected continued improvement.  (Tr. 390.)

In December 2008, Dr. Elizabeth Edmond, a physiatrist, examined Plaintiff on behalf of the State Disability Determination Services ("DDS").  (Tr. 399-405.)  On exam, Dr. Edmond found that

Plaintiff had a "waddling type gait" and needed a walking aid for balance and relief of knee pain. (Tr. 400.) She noted that Plaintiff had a reduced range of motion in his cervical spine and knees, but had a full range of motion in his shoulders, elbows, wrists, hips, and ankles. (Tr. 400.) Plaintiff also had a full range of motion in his digits, but his fifth digit on his left hand had a "tendency to be hyperextended." (Tr. 401.) Dr. Edmond concluded that Plaintiff's "fine and gross dexterity are limited to simple activities of daily living. He has the strength to open a jar. He can write and button. He has the dexterity to pick up a coin and tie shoelaces but has difficulty bending to the floor to do such. He cannot squat." (Tr. 401.)

In January 2009, a non-physician medical consultant, Patricia Hoskins, reviewed Plaintiff's medical file and completed a Physical RFC Assessment. (Tr. 427-34.) Ms. Hoskins provided that Plaintiff could "frequently" lift 10 pounds, stand and/or walk for a total of two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (Tr. 428.)

In May 2009, Plaintiff returned for a routine checkup with Dr. Wilsher. (Tr. 472.) Regarding his October 2008 knee surgery, Dr. Wilsher noted "[h]e is still not back to 100%, but he is doing better." (Tr. 472.)

Plaintiff next saw Dr. Wilsher on August 4, 2009; she noted, "[t]he patient is in today needing some paperwork completed." (Tr. 477.) Her office notes do not indicate that she reevaluated Plaintiff's limitations from his neck, back, or knees but instead did a "HEENT" (head, ears, eyes, nose, and throat) exam and listened to Plaintiff's heart and lungs. (Tr. 477.) As indicated, Dr. Wilsher completed paperwork on behalf of Plaintiff. (Tr. 484-90.) However, as will be discussed in further detail below, it appears that Dr. Wilsher did so by photocopying her August

2008 opinion and updating the date on the signature page to August 4, 2009. (*Compare* Tr. 334 *with*

490; *also compare* Tr. 329-34 *with* 484-90.)

In August 2009, Plaintiff returned for a follow-up visit with Dr. Sprague (who had performed

Plaintiff's knee surgery in October 2008). Dr. Sprague explained,

> Mr. Burbo has had eight surgical procedures on his knee. He now has
> a total knee replacement and though he is improved still has residual
> pain and this will always be. He will never be able to be gainfully
> employed in any physical activity. He is not able to do any walking,
> squatting, kneeling, climbing. Essentially, he ca[n] do sit-down work.
> He has some other neurologic deficits and issues that are being
> addressed by Neurosurgery. He is permanently and totally disabled
> as a result of the knee, not even taking into account the neurologic
> deficits. I have explained to him that he will never be able to perform
> close to any of the activities that he did prior.

(Tr. 533.)

### (c) Medical Evidence Regarding Plaintiff's Mental Impairments

In February 2007, Plaintiff underwent a "Comprehensive Assessment" by a social worker,

Elizabeth Davis, at the Guidance Center. (Tr. 379-83.) Plaintiff reported a past history of

polysubstance abuse and that he was attending alcoholics anonymous two times per week. (Tr. 379.)

Plaintiff explained that his disability and the fact that he is home with his wife all day caused tension

between them. (Tr. 379.) Davis, with concurrence from a psychiatrist, diagnosed Plaintiff with a

mood disorder due to his neck and back pain and assigned Plaintiff a moderate-range Global

Assessment Functioning ("GAF") score of 52. (Tr. 382.)[8]

---

[8] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("*DSM-IV*") 30 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 32.

-12-

In April 2008, Plaintiff ceased treatment at the Guidance Center.  Social Worker Davis noted that Plaintiff had made "significant" progress in identifying depression triggers, and "moderate" progress in anger management, but continued to struggle with sleep difficulties and had an alcohol relapse.  (Tr. 387.)  At the time of discharge, Plaintiff "stated he believed he did not need therapy any longer" but also expressed "worry as dates were approaching for determinations regarding financial issues."  (Tr. 387.)

On December 5, 2008, Dr. Basivi Baddigam, a psychiatrist, examined Plaintiff on behalf of the State DDS.  (Tr. 406-08.)  Plaintiff reported depression "with a lot of worrying."  (Tr. 406.)  He also told Dr. Baddigam that he was not sleeping well, he had poor concentration, did not socialize much, and got irritable and frustrated easily.  (Tr. 406.)  Plaintiff's mental status exam was largely unremarkable, however: Plaintiff was not delusional, his hygiene and grooming were "good," he did not exhibit any unusual or bizarre behavior, his thinking process was well organized, his mood was calm, he could repeat four numbers forwards and backwards and recall two objects after five minutes, he could perform simple calculations, and he answered a judgment question appropriately. (Tr. 408.)  Plaintiff did have problems with serial sevens, however (but appeared to do serial threes) and did not know the meaning of the proverb "the grass is greener on the other side."  (Tr. 407.)  Dr. Baddigam diagnosed Plaintiff with dysthymic disorder, in partial remission, assigned Plaintiff a moderate GAF score of 60, and opined that Plaintiff's prognosis was "guarded."  (Tr. 408.)

On December 18, 2008, Dr. Syd Joseph, completed a Psychiatric Review Technique Form ("PRTF") on behalf of the State DDS.  (Tr. 409-22.)  Regarding the "B Criteria" associated with

---

A GAF of 52 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *DSM-IV* at 34.

Listings 12.04 (Affective Disorders) and 12.09 (Substance Addiction Disorders), Dr. Joseph found that Plaintiff had "mild" limitations in activities of daily living, "moderate" limitations in both social functioning and concentration, persistence, or pace, and had no episodes of decompensation (of extended duration). (Tr. 419.) Dr. Joseph also completed a Mental RFC Assessment; there, he opined that Plaintiff had moderate difficulties in several categories, including, understanding, remembering, and carrying out "detailed" instructions and maintaining concentration for "extended" periods. (Tr. 423.) Dr. Joseph concluded, however, that the "claimant is able to understand and carry out and remember simple instructions[,] make judgments that are commensurate with the functions of unskilled tasks, has the ability to do simple repetitive tasks on a regular and continuous basis[,] gets along with family members, [attends] church regularly, [and] responds well to [C]ymbalta, [L]exapro." (Tr. 425.)

On September 4, 2009, a Dr. M. Wattson signed paperwork regarding Plaintiff's mental impairments. One form indicated that Plaintiff had "extreme" (i.e., beyond "marked") functional limitations in activities of daily living, social functioning, and concentration, persistence, or pace, and had repeated episodes of decompensation, each of an extended duration. (Tr. 480.) A second form indicated that Plaintiff had "marked" limitations in the ability to understand, remember, and carry out "simple" instructions. (Tr. 482.) When asked which medical findings supported the opinion, the second form provides, "see comprehensive medical records." (Tr. 483.) Critically, Dr. Wattson wrote, "I have only seen patient once[, today.] Forms filled out by therapist who has seen [patient] over past several months." (Tr. 481.) The referenced therapist apparently was a Mr. Petrous whom Plaintiff had started treatment with less than a month earlier. (*See* Tr. 189.) Although Mr. Petrous' notes are not in the record, an attorney summary of his August 2009 notes indicates that

-14-

Mr. Petrous assigned Plaintiff a GAF of 48[9] and diagnosed Plaintiff with Post Traumatic Stress

Disorder, acute stress, and severe body and emotional stress and pain.  (*See id.*)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits and Supplemental

Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475

F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are
> denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments
> that "significantly limits . . . physical or mental ability to do basic work activities," benefits
> are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe
> impairment that is expected to last for at least twelve months, and the severe impairment
> meets or equals one of the impairments listed in the regulations, the claimant is conclusively
> presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied
> without further analysis.

---

[9]  A GAF of 48 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *DSM-IV* at 34.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings

The ALJ made the following findings in performing the five-step disability analysis. At step one, ALJ Roulhac found that Plaintiff has not engaged in substantial gainful activity since May 14, 2008—the alleged onset date applicable on this appeal. (Tr. 131.) At step two, he found that Plaintiff had the following severe impairments: "degenerative disc disease of the cervical and lumbar spine; disc herniation of the cervical spine; chronic right knee pain, status post multiple surgeries including total knee replacement; obesity; hearing loss in right ear; depression; left arm pain; and history of closed head injury." (Tr. 131.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 131.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant is limited to sitting for six hours and standing for two hours in an 8-hour workday; lifting not more than 10 pounds with pushing and pulling consistent with those weight restrictions; a sit/stand option at the employer's tolerance; occasionally balancing, stooping, kneeling, crouching and crawling but no climbing ladders, ropes or scaffolds, occasional climbing ramps and steps; use of a cane for ambulation and balance; avoid unprotected heights; and limited to performing simple tasks.

-16-

(Tr. 132.)  At step four, he found that Plaintiff could not perform any past relevant work.  (Tr. 138-39.)  At step five, the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform: surveillance system monitor, assembler, and inspector.  (Tr. 139.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice

-17-

within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

**F. Analysis**

Plaintiff asserts that the ALJ committed a multitude of errors in evaluating Plaintiff's disability applications. Specifically, Plaintiff argues that

- (1) "the ALJ failed to explain why he found [P]laintiff's hearing testimony to lack credibility" (Pl.'s Mot. Summ. J. at 14; *see also id.* at 14-16);

- (2) the ALJ improperly discounted the opinions of his treating physicians, Drs. Wilsher and Wattson (*id.* at 9-13);

-18-

- (3) the ALJ created an inaccurate RFC assessment and/or hypothetical by excluding additional limitations caused by Plaintiff's left-hand impairment, spinal problems, and mental impairments (*id.* at 5-6, 16-17, 18);

- (4) the objective medical evidence, contrary to the ALJ's step-three conclusion, demonstrates that Plaintiff met Listings 1.02 and 1.04 (*id.* at 3-5; *see also id.* at 16);

- (5) the ALJ erred by failing to acquire an updated PRTF from a medical consultant after Dr. Wattson provided psychiatric his September 2009 assessments (*id.* at 8-9);

- (6) one of the jobs the VE testified Plaintiff could perform, a surveillance system monitor, is in fact no longer considered unskilled work (*id.* at 16); and

- (7) because Plaintiff proceeded pro se at the second hearing before the ALJ, the ALJ should have given Plaintiff advanced notice that a VE would testify so Plaintiff could prepare questions for cross examination (*id.* at 19).

The Court will consider these claims of error in this order.

### 1. The ALJ Erred in Evaluating Plaintiff's Credibility

Plaintiff argues that the ALJ incorrectly weighed Plaintiff's testimony.  (Pl.'s Mot. Summ. J. at 14-15.)  Plaintiff also argues that "the ALJ failed to explain why he found [P]laintiff's hearing testimony to lack credibility" and that "a clearly explained adverse credibility finding is absent from the ALJ's decision." (*Id.* at 14.)  Because this latter argument is a procedural one, it is appropriate to begin there.

Plaintiff is correct that an ALJ has a duty to provide a rational, non-conclusory explanation for his credibility analysis.  In particular, Social Security Ruling ("S.S.R.") 96-7p provides, in pertinent part,

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 WL 374186, at *2; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732 (N.D. Ohio 2005) ("Regardless of whether harmless error can excuse inadequate articulation of credibility decisions, the strong statement from [S.S.R. 96-7p] constitutes a clear directive to pay as much attention to giving reasons for discounting claimant credibility as must be given to reasons for not fully accepting the opinions of treating sources.").[10]

S.S.R. 96-7p's explanatory requirement does not require an ALJ to explicitly discuss each of the credibility-weighing factors identified in 20 C.F.R. § 404.1529(c)(3). *See Bowman v. Chater*, 132 F.3d 32 (table), 1997 WL 764419, at *4 (6th Cir. 1997) ("While this court applied each of [the § 404.1529(c)(3)] factors in [*Felisky v. Bowen*, 35 F.3d 1027, 1039-1040 (6th Cir. 1994)] we did not mandate that the ALJ undergo such an extensive analysis in every decision."). And this Court is well

---

[10]   SSRs "are binding on all components of the Social Security Administration" and "represent precedent final opinions and orders and statements of policy and interpretations" adopted by the agency. 20 C.F.R. § 402.35(b)(1); *see also Evans v. Comm'r of Soc. Sec.*, 320 F. App'x 593, 596, 2009 WL 784273, at *2 (9th Cir. Mar. 25, 2009) ("'Federal statutes, administrative regulations and Social Security Rulings together form a comprehensive scheme of legal standards that ALJs must follow in determining whether a claimant is entitled to disability benefits.'" (quoting *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990)).

aware of the deference owed an ALJ's credibility determinations.[11]  But, as the Sixth Circuit has explained,

> [Under Social Security Ruling 96-7p,] blanket assertions that the claimant is not believable will not pass muster, *nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence.* . . . [W]hile credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence.

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-49 (6th Cir. 2007) (emphasis added); *see also Bolden v. Comm'r of Soc. Sec.*, No. 03-cv-74136, 2005 WL 1871121, at *8 (E.D. Mich. Aug. 8, 2005) *report adopted by Bolden*, No. 03-cv-74136 (E.D. Mich. July 13, 2005) (explaining that under S.S.R. 96-7p, "the ALJ's decision must be based on specific reasons for the findings of credibility. *These reasons must be supported by substantial evidence in the record*." (emphasis added)).

---

[11] Heightened deference to an ALJ's credibility determination is based on the general rule that ALJ factual findings are reviewed for substantial evidence and the more specific rationale that the ALJ is able to evaluate a testifying witness's demeanor while this Court cannot.  But the Court does not understand this deference to mean that the ALJ need not provide reasons for discounting a Plaintiff's credibility that are supported by substantial evidence – indeed, this would render much of S.S.R. 96-7p surplusage.  Rather, special deference is owed to the ALJ's credibility determination when the ALJ follows the correct process for reaching that determination.  Moreover, here, the ALJ did not state that his credibility determination was based on anything he observed at the hearing.

The Court also notes that the Commissioner's suggestion that credibility findings are "unchallengeable" is somewhat misleading.  The cited authority in fact provides:

> The ALJ's credibility findings are unchallengeable . . . *or* they "are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." . . . [In the present case,] the ALJ's adverse credibility determination *is supported by substantial evidence.*

*Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 113 (6th Cir. 2010) (emphasis added).

In this case, the Court cannot say that the reasons the ALJ gave for discounting Plaintiff's testimony are supported by substantial evidence.  In evaluating Plaintiff's credibility, aside from using standardized language (*see* Tr. 133-34), the ALJ provided:

> In analyzing the credibility of the claimant's subjective complaints, the undersigned has considered the medical records and the claimant's testimony.  The claimant has testified that he has pain of 9/10 without medication and 6/10 with medication.  The claimant said that he has to use a cane, it is difficult to move his left leg and he has a hard time climbing stairs.  However, at the consultative examination the claimant was able to dress and undress himself, get on and off the examination table with a stool, open a jar, button, tie shoelaces and pick up a coin. At the December 23, 2009, hearing the claimant said that he can stand for about 2 ½ minutes, walk for 30 yards, sit for 15 minutes and lift a pound.  But, in August 2009 the claimant's doctor said the claimant could walk for 30 minutes and lift up to 5 pounds. The claimant's wife admitted at the hearing that the claimant had a closed head injury that interferes with his memory. Accordingly, the undersigned finds that the claimant's allegations are not credible to the extent they are inconsistent with the residual functional capacity assessment.

(Tr. 138.)  Essentially then, the ALJ gave three justifications for discounting Plaintiff's credibility.  Each is problematic.

First, the ALJ stated that "at the consultative examination the claimant was able to dress and undress himself, get on and off the examination table with a stool, open a jar, button, tie shoelaces and pick up a coin."  (Tr. 138.)  The ALJ prefaced this sentence with "however," indicating that he found this evidence contradictory to what precedes it: "The claimant has testified that he has pain of 9/10 without medication and 6/10 with medication.  The claimant said that he has to use a cane, it is difficult to move his left leg and he has a hard time climbing stairs."  (Tr. 138.)  The Court fails to see the inconsistency.  That Plaintiff could dress himself, get *off* an exam table with a stool, and button his clothes has very little, if anything, to do with whether Plaintiff suffers from 6/10 pain with

medication, his need for a cane, his inability to move his left leg very well, and his difficulty *climbing* stairs. Moreover, the ALJ's characterization of the consultative examiner's findings is not even accurate. The examiner in fact said Plaintiff "*has the dexterity* to pick up a coin and tie shoelaces"; she then clarified, "but has difficulty bending to the floor to do such. He cannot squat." (Tr. 401 (emphasis added).)

Next, the ALJ stated that "[a]t the December 23, 2009, hearing the claimant said that he can stand for about 2 ½ minutes, walk for 30 yards, sit for 15 minutes[,] and lift a pound. But, in August 2009 the claimant's doctor said the claimant could walk for 30 minutes and lift up to 5 pounds." (Tr. 138.) As an initial matter, the ALJ appears to have misstated Dr. Wilsher's opinion. Dr. Wilsher in fact found that Plaintiff could "occasionally" lift one to five pounds – the lowest option available on the form absent a finding that Plaintiff could never lift any weight. (Tr. 489.) And, although her opinion is a bit ambiguous, it appears that she also stated that Plaintiff could continuously stand or walk for at most 15 minutes before sitting or lying down. (Tr. 486.) These findings by Dr. Wilsher – especially her lifting assessment – are less inconsistent with Plaintiff's testimony than the ALJ suggested.

But even placing any factual misstatement aside, the ALJ essentially reasoned that Plaintiff's testimony was inconsistent with his own treating source. While the form of this argument is sound, it is questionable as applied in this case: elsewhere the ALJ discredited the referenced treating source opinion and assigned it "little" and "limited" weight. (Tr. 138.) To the extent that the ALJ meant that Plaintiff's testimony indicated severity beyond that of a treating-source opinion that was itself not supported by objective medical evidence, and, therefore, transitively, Plaintiff's allegations were not supported by objective medical evidence, the Court notes that objective medical evidence is far

-23-

from the only criteria an ALJ should consider in evaluating the alleged limiting effects of a claimant's symptoms. *See Bowman*, 132 F.3d 32 (table), 1997 WL 764419, at *4 ("[W]e [have] held that where the medical record does not contain objective evidence to support pain allegations, such allegations may not be dismissed without a review of non-medical factors."); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247-48 (6th Cir. 2007) ("Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints 'based on a consideration of the entire case record.' The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. Consistency of the various pieces of information contained in the record should be scrutinized.").

Finally, the ALJ discounted Plaintiff's credibility because "[t]he claimant's wife admitted at the hearing that the claimant had a closed head injury that interferes with his memory." (Tr. 138.) To the extent that Plaintiff's memory is so poor that he cannot even recall how long he can sit, stand, or walk, or how much he can lift, (activities that Plaintiff engages in on a daily basis) this would appear to seriously undermine the ALJ's conclusion that Plaintiff retains the residual functional capacity to understand, remember, and carry out simple instructions on a sustained basis. *See* S.S.R. 96-9p, 1996 WL 374185 at *9 (defining unskilled work). Moreover, to the extent that the ALJ found Plaintiff's wife credible with regards to Plaintiff's memory, there is no explanation why her testimony as to Plaintiff's need to lie down for extended periods during the day should be discredited. (Tr. 83.)

-24-

To the extent that there is a harmless error exception to 96-7p, *see Cross*, 373 F. Supp. 2d at 733 (finding it unnecessary to decide whether 96-7p's "articulation requirement can be excused for harmless error"), and to the extent that the Commissioner would argue for such an exception, the Court would decline to apply it here.  In particular, while substantial evidence may exist in the record to support discounting Plaintiff's credibility, there is enough evidence unaddressed by the ALJ such that remand would not be an "idle and useless formality," *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766-67, n.6 (1969) (plurality opinion).  Regarding some of the factors listed in 20 C.F.R. § 404.1529(c)(3),[12] the Court notes that Plaintiff has used a cane since 2004, has taken Vicodin two or three times on a daily basis for well over a year, has had eight surgeries to his right knee including replacement surgery at age 45, and has had a doctor recommend a cervical fusion.  (Tr. 18; Tr. 97; Tr. 324 (Vicodin prescription in November 2007), Tr. 469 (Vicodin prescription in May 2009); Tr. 377 ("He is requesting undergoing a total knee replacement arthroplasty.  He understands he is only 45 years old and is approximately 200 pounds."); Tr. 399.)  Further, Plaintiff's wife's testimony is consistent with Plaintiff's and the ALJ did not say whether she was credible.  And a state medical

---

[12] 20 C.F.R. § 404.1529(c)(3) provides,

> Factors relevant  to your symptoms, such as pain, which we will consider include: (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

consultant, whose opinion the ALJ in large part adopted (*see* Tr. 138), stated that "[b]ased on the [objective] medical evidence, [claimant's] allegations of severity appear to be supported and [claimant] appears credible," (Tr. 434). Accordingly, this Court cannot readily determine that the ALJ's non-compliance with S.S.R. 96-7p was harmless. *See Marok v. Astrue*, No. 5:08CV1832, 2010 WL 2294056, at *8-9 (N.D. Ohio June 3, 2010) ("[C]ourts apply a harmless error analysis cautiously, taking care to avoid rewriting an ALJ's decision post hoc even when substantial evidence exists to support the ALJ's decision.").

Given the foregoing, remand is required for the ALJ to reevaluate Plaintiff's credibility and, if it is to again be discounted, to provide good reasons for doing so.

For purposes of streamlining the proceedings on remand, the Court will address Plaintiff's remaining claims of error and indicate which arguments are moot under the recommendation to remand.

### 2. The ALJ Did Not Commit Reversible Error in Evaluating the Opinion Evidence

Under the treating source rule, an ALJ must generally give greater deference to the opinions of treating physicians than to those of non-treating physicians. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527; SSR 96-2p. The rationale behind this rule is straightforward:

> treating sources . . . are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

-26-

Treating-source analysis proceeds in two steps.  First, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* S.S.R. 96-2p.  Second, where an ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must consider the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source."  *Id.*; 20 C.F.R. § 404.1527.  In addition, the treating-source rule contains a procedural, explanatory requirement that an ALJ give "good reasons" for the weight given a treating-source opinion.  *See e.g.*, *Wilson*, 378 F.3d at 544; *Rogers*, 486 F.3d at 243 ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.").

Plaintiff argues the ALJ erroneously rejected or discounted the opinions of two treating sources: Dr. Wilsher and Dr. Wattson.  (Pl.'s Mot. Summ. J. at 9-13.) The Court considers these claims in turn.

*(a) Dr. Wilsher's Opinions*

The ALJ gave Dr. Wilsher's August 2008 opinion "little weight" and similarly accorded her August 2009 opinion "limited weight." (Tr. 138.) In particular, after summarizing the findings in each of the two opinions (Tr. 137), the ALJ stated,

> [The Sixth] Circuit has held that an Administrative Law Judge is not bound by a treating physician's opinion where there is substantial medical evidence to the contrary. Such opinions are only accorded great weight when they are supported by sufficient clinical findings and are consistent with the record . . . . It is noted that Dr. Wilsh[er's] opinion was rendered two months prior to the claimant's right total knee replacement and that the limitations she included regarding the claimant's neck and left hand are not well supported by the objective medical evidence. In fact, a progress note dated May 12, 2009 notes that the claimant is in general, doing okay. ["]He had knee replacement on in October. He's still not back to 100% but he is doing better." [(Tr. 472.)] Therefore the undersigned gives Dr. Wilshire's opinion from August 2008 little weight. After carefully considering the testimony and medical record as a whole, the undersigned finds the claimant less limited than the August 2009 assessment, and thus attributes only limited weight to that assessment.

(Tr. 137-38 (citations to case law omitted).)

The foregoing is not a paragon treating-source analysis. The ALJ correctly recognized that a treating-source opinion is not entitled to controlling weight where it is either not well-supported by "medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in the case record." *See* S.S.R. 96-2p, 1996 WL 374188, at *4. But even when this is true, the treating-source's opinion may still be accorded substantial deference and is to be weighed using the non-exclusive list of five factors recited above (e.g., the length of the treating relationship and the consistency of the opinion with the record as a whole). *See id.* Although an

-28-

explicit discussion of the factors would have been preferable, the Court concludes that the ALJ gave the requisite "good reasons" for discounting Dr. Wilsher's opinions.

The ALJ essentially concluded that Dr. Wilsher's August 2008 opinion was not well-supported by objective medical evidence. This was a reasonable conclusion. Dr. Wilsher's August 6, 2008 exam note suggests that she did not base her August 2008 opinion on objective medical evidence or her own physical examination of Plaintiff's neck, back, or knee impairments:

> The patient comes in today for followup. He needs paperwork filled out for social security disability. He has problems with neck pain, back pain, arm pain, and leg pain related to those as well as chronic right knee pain. He states that he is supposed to have an additional surgery on the right knee. He has had six surgeries previously. . . . Necessary paperwork was completed *with help from him as far as what his limitations are. Follow up for full physical at a later date.*

(Tr. 360 (emphasis added).) Similarly, in May 2008, Dr. Wilsher noted that Plaintiff "should follow up . . . in the near future for full physical." (Tr. 361.)

Moreover, any temptation this Court has in remanding this case for further explanation from the ALJ as to why he discounted Dr. Wilsher's opinion is largely quelled by three significant considerations. First, with regard to Dr. Wilsher's March 2008 opinion, ALJ Gil, in deciding Plaintiff's prior disability application, reasoned similarly to ALJ Roulhac in this case:

> On March 12, 2008, Dr. Diana Wilsher opined that the claimant can lift or carry 10 pounds occasionally and 5 pounds continuously; can sit for 3 ½ hours in an eight-hour workday, 30 minutes with out interruption; can stand for 1 hour in an eight-hour workday, 25 minutes without interruption; can walk 1 hour in an eight-hour workday, 20 minutes without interruption; and can never stoop, squat, kneel, crouch, or crawl. I give this part of Dr. Wilsher's opinion little weight because it is inconsistent with the objective evidence of record. Specifically, the claimant's physical impairments are not so severe as to justify the restrictive exertional and postural limitations in Dr. Wilsher's opinion.

-29-

(Tr. 98.)   And Dr. Wilsher's March 2008 opinion is similar to her later opinions in a number of

significant respects, including, Plaintiff's sitting, standing, and walking limitations.  (*Compare* Tr.

325 *with* Tr. 330-31.)  And there is nothing in the record that suggests that Plaintiff's condition

materially changed between March and August 2008.  Therefore, the Court finds the Sixth Circuit's

conclusion regarding Dr. Wilsher's March 2008 opinion persuasive as to her subsequent August

2008 opinion:

> Here, the ALJ rejected a portion of Dr. Wilsher's opinion dealing
> with exertional and postural limitations. The ALJ concluded that
> Burbo could occasionally stoop, crouch, kneel, crawl, and bend –
> activities that Dr. Wilsher felt that Burbo could not perform. The
> record establishes that Dr. Wilsher's extreme restrictions as to these
> activities are not supported by objective evidence, and Dr. Wilsher
> provided no objective findings to support her recommendations. The
> ALJ also rejected Dr. Wilsher's opinion that Burbo could only walk
> for one hour per workday, stand for one hour per workday, and sit for
> three-and-a-half hours per workday. . . .  Moreover, other medical
> evidence from the same time period as Dr. Wilsher's report describes
> Burbo as having a "normal stance," "[h]eel, toe, and tandem walking
> . . . without difficulty," and muscle strength of "5/5 bilaterally." [Ex.
> 31F]  Because Dr. Wilsher's opinion is not supported by objective
> medical evidence, the ALJ had good cause to reject the restrictions.
> [*See Hall v. Bowen*, 837 F.2d 272,  276 (6th Cir. 1988).]

*Burbo I*, No. 09-13663 (6th Cir. Sept. 21, 2011) (Order from Court of Appeals, Dkt. 28 at 6-7.)

Second, Dr. Wilsher's August 2008 and August 2009 opinions are self-contradictory.  They

provide that Plaintiff can sit for about 3 hours (total), and stand and/or walk for about 2 hours (total)

in an eight-hour workday.  (Tr. 330-31, 486-87.)  Yet, they also provide that Plaintiff needs to lie

down for six hours in an eight-hour workday.  (Tr. 331, 487.)  Taking these findings at face value,

the total time between lying, sitting, standing and/or walking would be 11 hours – more than the time

in an eight-hour day.

-30-

Third, the Court finds problematic that Dr. Wilsher's August 2009 opinion is a photocopy of her August 2008 opinion.  (*Compare* Tr. 334 *with* 490; *also compare* Tr. 329-34 *with* 484-90.)  The recycled opinion suggests that at least that opinion was not based on recent testing of Plaintiff's functional limitations.  In fact, Dr. Wilsher's office notes for the day she "authored" the August 2009 opinion do not indicate that she reevaluated Plaintiff's limitations from his neck, back, or knees or that she was relying on any such evaluation between August 2008 and August 2009.  (Tr. 477.)

Given all of the foregoing,  the Court finds no reversible error in the ALJ's treatment of Dr. Wilsher's opinions.

### (b) Dr. Wattson's Opinions

Turning next to Dr. Wattson's opinions, the Court notes that he was not a treating source as that term is used in the Social Security regulations.  Given the rationale behind the treating-source rule (that treating sources are in the unique position to give an opinion based on a longitudinal view of the claimant) it follows that not every physician who treats a claimant is a treating source.  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) ("[20 C.F.R. § 404.1527(d)] recognizes that not all medical sources need be treated equally, classifying acceptable medical sources into three types: nonexamining sources, nontreating (but examining) sources, and treating sources.").  In fact, in the Sixth Circuit, a single examination of a claimant by a physician or psychiatrist does not, as a matter of law, form the requisite treating-source relationship.  *Pethers v. Comm'r of Soc. Sec.*, 580 F. Supp. 2d 572, 579 n.16 (W.D. Mich. 2008) ("In our Circuit, as a matter of law, more than one examination is required to attain treating-physician status."); *see also Kornecky v. Commissioner of Social Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006) ("A plethora of decisions unanimously hold that a single visit does not constitute a treating relationship.").

-31-

Here, regarding "his" September 2009 opinions, Dr. Wattson wrote, "I have only seen [the] patient once[, today.] Forms filled out by therapist who has seen [patient] over past several months." (Tr. 481.)  Accordingly, Dr. Wattson was not a treating source. *See Kornecky*, 167 F. App'x at 506.

Plaintiff responds that "[s]ome of the doctors and therapist over this period left the clinic which meant Mr. Burbo was assigned to other therapists and doctors but his entire record of treatment was used by the other treating doctors and therapists on which these opinions are based on. [Dr. Wattson's] statement was misconstrued or misunderstood to make it appear as though the doctor had no history to base this opinion on." (Pl.'s Mot. Summ. J. at 10.)  The problem with this argument is that Dr. Wattson did not indicate that he reviewed any of Plaintiff's records prior to signing the assessment completed by the therapist. *Cf. McCombs v. Comm'r of Soc. Sec.*, No. 2:09-cv-332, 2010 WL 3860574, at *6 (S.D. Ohio Sept. 24, 2010) ("[A]n individual does not automatically qualify as a treating source simply because they are employed at a facility where the claimant regularly receives treatment.").  In fact, his statement that a therapist completed the forms suggests otherwise.  Moreover, the therapist referenced by Dr. Wattson, apparently a Mr. Petrous, had only begun treating Plaintiff less than a month before Dr. Wattson signed his opinion.  (*See* Tr. 189.)  Indeed, it appears Plaintiff had ceased treatment at the Guidance Center between April 2008 and August 2009.  (*See* Tr. 387-88, 189.)

Because Dr. Wattson was not a treating source, the ALJ was not required to give his opinion special deference nor was he required to explain at great length why he rejected it.  Moreover, the Court finds it reasonable for the ALJ to have rejected the opinion because of its extreme severity coupled with the fact that Dr. Wattson never evaluated or examined Plaintiff.  Regarding the former, although the ALJ perhaps incorrectly stated that there was "no" record of any psychiatric treatment

-32-

after April 2008, the ALJ was correct to the extent that Plaintiff's psychiatric treatment was very limited between April 2008 and September 2009 (when Dr. Wattson signed the opinion). (*See* Tr. 387-88, 189.) Substantial evidence supports the ALJ's treatment of Dr. Wattson's opinions.

In sum, the Court finds no reversible error in the ALJ's weighing of Plaintiff's treating source opinions.

> *3. The ALJ Did Not Necessarily Commit Reversible Error By Omitting Additional Limitations from His RFC Assessment or Hypothetical Provided to the Vocational Expert*

Plaintiff next argues that "[a]lthough the ALJ's hypothetical accurately conveys several of Plaintiff's limitations, it nonetheless omits several critical elements. The ALJ failed to include concentrated impairments in his hypothetical's to the VE, mainly claimant's bilateral hand impairment, persistence and pace related to symptoms of Spinal Stenosis with nerve and cord compression, along with the mental limitations." (Pl.'s Mot. Summ. J. at 18; *see also id.* at 5-7.)

Regarding whether the ALJ should have included additional limitations to compensate for Plaintiff's neck and back problems, this issue is moot in view of this Court's recommendation to remand for the ALJ to reevaluate Plaintiff's credibility, including Plaintiff's statements about his ability to sit, stand, and walk. The Court will, however, address Plaintiff's other two claims of error.

While perhaps not reversible error on its own, the ALJ should discuss Plaintiff's left-hand impairment on remand. The medical evidence in this regard is not insubstantial. Even setting aside Dr. Wilsher's opinions (including her left-hand functional limitations), her office notes provide "right hand function is fine, left hand is limited with regard to grasp deformity that he suffers in the fifth digit," and "[m]uscle weakness in the left forearm and in the grip on the left side." (Tr. 321, 324.) In March 2005, Dr. Colwell found that Plaintiff's "[g]rip also seemed to be slightly decreased

-33-

though[;] [he] . . . apparently had some injury to his hand in the past.  His fourth finger hyperextends at the interphalangeal joint."  (Tr. 457.)  Even the State DDS physician, Dr. Edmond, found that Plaintiff's "[r]ight grip strength is 30-kg; left is 13-kg" and "[t]here is full range of motion of the digits of both hands, though it is noted that the left hand fifth digit PIP joint has a tendency to be hyperextended.  [Flexing] this digit voluntarily produces a clicking sound with no associated complaint of pain."  (Tr. 400-01.)  Accordingly, on remand, the ALJ should discuss the substantial evidence supporting his exclusion of a left-hand limitation from his RFC assessment.

Turning to Plaintiff's mental limitations, the Court finds – unless the ALJ believes that Plaintiff's memory is so poor that he cannot recall how long he can sit, stand, or walk, *see* Part II.F.1 *supra* – that the ALJ's limitation of "simple tasks" adequately accounts for Plaintiff's  depression and mental condition.  In February 2007, a Guidance Center social worker, with concurrence from a psychiatrist, assigned Plaintiff a GAF score reflecting moderate symptoms.  (Tr. 382.)  In April 2008, although Plaintiff argues that his inability to pay was the cause, Plaintiff ceased treatment with the Guidance Center stating that he did not need therapy any longer.  (Tr. 387.)  In December 2008, a State DDS psychiatrist, Dr. Baddigam, conducted a mental-status exam which was largely normal and assigned Plaintiff a moderate GAF score of 60.  (Tr. 406-08.)  Later that month, Dr. Joseph concluded that the "claimant is able to understand and carry out and remember simple instructions[,] make judgments that are commensurate with the functions of unskilled tasks, has the ability to do simple repetitive tasks on a regular and continuous basis . . . ."  (Tr. 425.)  Only the opinion that Dr. Wattson signed is contrary to the foregoing medical evidence, and, as discussed, the ALJ reasonably rejected that opinion.  Accordingly, the Court finds that substantial evidence supports the ALJ's conclusion that a limitation of "simple tasks" adequately accounts for Plaintiff's mental limitations.

-34-

### 4. *The ALJ Did Not Err in Finding that Plaintiff Did Not Meet a Listed Impairment*

Plaintiff also asserts that the record evidence "show[s] the necessary objective MRI and CAT scans along with examination reports to show Lumbar and Cervical Spinal Stenosis with nerve involvement and pseudoclaudication to meet the listing requirements for 1.02A, 1.04A and 1.00B2b." (Pl.'s Mot. Summ. J. at 4.) This Court disagrees.

Subpart A of Listing 1.02 requires a claimant to show "Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.02. In turn, Listing 1.00(B)(2)(b)(1) provides:

> Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(B)(2)(b)(1) (emphasis added). Plaintiff walks with a cane, but, as the Sixth Circuit noted in deciding Plaintiff's prior disability appeal, "Although Burbo walked with a limp, the medical evidence established that he could engage in heel and toe walking. Dr. Wilsher, a treating physician, prescribed Burbo a cane, but did not prescribe two canes as would be required in order to satisfy the listing. Dr. Wilsher even informed Burbo that he could occasionally climb stairs and ramps." *Burbo I*, No. 09-13663 (6th Cir. Sept. 21, 2011) (Order from Court of Appeals, Dkt. 28 at 2). Moreover, the objective evidence Plaintiff now cites predates the alleged onset date of May 14, 2008 by a wide margin and appears to have been presented to ALJ Gil

-35-

(and the courts on appeal) in deciding Plaintiff's prior disability application.  Upon review of the present record, substantial evidence supports the ALJ's conclusion that Plaintiff did not meet the requirement in Listing 1.00(B)(2)(b).

Subpart A of Listing 1.04 requires "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) *accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)*."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04 (emphasis added).  Again, as just noted, the most recent diagnostic testing Plaintiff offers in support of his claim is from before 2007 (*see* Pl.'s Mot. Summ. J., Ex. 1) and it appears that all such evidence was part of the record accompanying Plaintiff's prior disability application.  And regarding that prior application, the Sixth Circuit held:

> [A]lthough Burbo cites to evidence that could suggest a nerve root compression in the cervical and lumbar regions of the spine as required by Listing 1.04(A), he still does not satisfy the requirements of that section.  His medical examinations did not document the sensory or reflex deficits in his upper extremities that would be required to establish a cervical spine condition.  Further, the record does not consistently establish the required positive straight-leg-raising test results in the positions necessary to meet the listing for a lumbar spine condition.  Since 2002, even Dr. Wilsher, Burbo's treating physician, did not indicate any reflex or sensory deficits.

*Burbo I*, No. 09-13663 (6th Cir. Sept. 21, 2011) (Order from Court of Appeals, Dkt. 28 at 3).

A review of the medical evidence subsequent to the disability period at issue before the Court of Appeals reveals that the Sixth Circuit's reasoning still applies in this case.  Dr. Wilsher's August 2008 opinion indicates that Plaintiff had no sensory or reflex deficits in his upper extremities.  (*See* Tr. 329 (checkbox for sensory or reflex changes left blank); *see also* Tr. 484.)  Dr. Edmond

-36-

concluded in December 2008 that Plaintiff's sensory perception was "intact." (Tr. 401.) Neither Drs. Edmond, Wilsher, or Sprague found that Plaintiff had a positive straight-leg-raising result at least since the alleged onset date. Although Plaintiff argues that Dr. Edmond found that Plaintiff's straight-leg test was positive, she in fact found "[s]traight leg raising at 90 [degrees] on the left produced a complaint of knee pain, as does 80 [degrees] on the right." (Tr. 400 (emphasis added).) But a "straight leg raise test is positive if pain in the sciatic distribution is reproduced between 30° and 70° passive flexion of the straight leg." Cathy Speed, *Low Back Pain*, 328 British Med. J. 1119 (2004). Substantial evidence therefore supports the ALJ's conclusion that Plaintiff does not meet Listing 1.04.[13]

### 5. *The ALJ Did Not Err by Not Acquiring an Updated PRTF*

Plaintiff asserts the ALJ erred by failing to acquire an updated Psychiatric Review Technique Form ("PRTF") after Dr. Wattson provided psychiatric assessments in September 2009. Plaintiff asserts that S.S.R. 96-6p demands this result. (Pl.'s Mot. Summ. J. at 8.) That Ruling provides, in pertinent part,

> When an administrative law judge or the Appeals Council finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by

---

[13] Plaintiff briefly argues that the ALJ erred in concluding that there was "no evidence of nerve root compression or lumbar stenosis resulting in pseudoclaudication." (Pl.'s Mot. Summ. J. at 6.) This pertains to Subpart C of Listing 1.04. But this Subpart requires Plaintiff to meet the ineffective ambulation requirement of Listing 1.00(B)(2)(b)(1).

To the extent Plaintiff argues that he met listing 12.04 for Affective Disorders, Plaintiff relies almost exclusively on evidence from his prior disability application. In fact, many of the records Plaintiff cites are not even part of the present administrative record. (Pl.'s Mot. Summ. J. at 9 (citing administrative record pages above 600).) In *Burbo I*, the Sixth Circuit held that Plaintiff did not meet listing 12.04. *Burbo I*, No. 09-13663, at 3-6 (6th Cir. Sept. 21, 2011) (Order from Court of Appeals, Dkt. 28).

a State agency medical or psychological consultant. However, an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:

> [1] When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

> [2] When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

S.S.R. 96-6p, at 1996 WL 374180, *3-4.

Neither prong of the Ruling fits here. Nothing suggests that the ALJ was of the "opinion" that "the symptoms, signs, and laboratory findings" regarding Plaintiff's mental impairments "suggest that a judgment of equivalence may be reasonable." To the contrary, the ALJ found that Plaintiff had no, mild, and moderate difficulties in the three rated B Criteria and no episodes of decompensation of extended duration. (Tr. 132.) This is far short of Listing-level severity: "marked" limitations in two of the rated B Criteria or one "marked" limitation and repeated episodes of extended duration. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04B. Regarding Plaintiff's suggestion that Dr. Wattson's September 2009 opinions were "additional medical evidence," the ALJ made his opinion clear on whether those opinions would "change the State agency medical or psychological consultant's finding[s]." He rejected Dr. Wattson's opinions. And, the Court has already found that the ALJ's decision to do so was supported by substantial evidence. Accordingly, the Court finds that the ALJ did not violate S.S.R. 96-6p.

-38-

### 6.  The Remainder of Plaintiff's Arguments Are Moot or Lack Merit

Plaintiff claims that one of the jobs the VE testified Plaintiff could perform, surveillance system monitor, is no longer considered unskilled work due to heightened training requirements for a license from the Department of Homeland Security.  (Pl.'s Mot. Summ. J. at 16.)  Plaintiff also argues that because he proceeded *pro se* at the second hearing, the ALJ should have given Plaintiff advance notice that a VE would testify so he could prepare questions for cross examination.  To the extent that the ALJ deems it appropriate to elicit VE testimony on remand, these arguments are moot.

In any event, the Court finds that these arguments lack merit.  Even if *all* surveillance system monitor positions are no longer unskilled work (a highly questionable proposition), both VEs who testified provided other sedentary, unskilled jobs that Plaintiff could perform.  (Tr. 69-70 (information clerk in the railroad transportation industry, telephone quotation clerk, document preparer); Tr. 86 (assembler and inspector).)[14]  As for Plaintiff's argument that he lacked notice about VE testimony at the December 2009 hearing, the Court notes that a VE testified at the September 2009 hearing which both Plaintiff and his wife attended.  (Tr. 48).  Plaintiff therefore had adequate notice that a VE may testify at the second hearing.  Further, the hypothetical provided to the VE in the first hearing was similar to that provided to the VE at the second hearing.  The Court finds no error in the ALJ's failure to provide explicit, advance notice that a VE would testify at Plaintiff's December 2009 hearing.

---

[14]  Of course, should the ALJ, in discussing Plaintiff's left-hand impairment find that some type of manipulation limitation be included in his RFC assessment, a new hypothetical should be provided to a VE to consider.

### G.  Conclusion

For the foregoing reasons, this Court finds that the reasons the Administrative Law Judge gave for discounting Plaintiff's credibility are not supported by substantial evidence.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless,

-40-

by motion and order, the page limit is extended by the court.  The response shall address  each issue

contained within the objections specifically and in the same order raised.


                                s/Mark A. Randon
                                Mark A. Randon
                                United States Magistrate Judge

Dated:  December 20, 2011


<u>Certificate of Service</u>

*I hereby certify that a copy of the foregoing document was served on the parties of record on this date, December 20, 2011, electronically.*

                                *s/Melody R. Miles*
                                *Case Manager to Magistrate Judge Mark A. Randon*
                                *(313) 234-5542*